**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

———————————————————— )
DENISE CAMPBELL, on behalf of herself ) 
and those similarly situated, )
     Plaintiff, )
  )
   v. )    CIVIL ACTION NO. B-09-197
  )
IMMUNOSYN CORPORATION, )
ARGYLL BIOTECHNOLOGIES, LLC, )
JAMES T. MICELI, DOUGLAS A. )
MCCLAIN, JR, FRANK MORALES, )
ARGYLL EQUITIES, LLC, )
STEPHEN FERRONE, and DOUGLAS )
A. MCCLAIN, SR., )
     Defendants. )
———————————————————— )

**FIRST AMENDED COMPLAINT AND JURY DEMAND
AND PROPOSED CLASS ACTION COMPLAINT**

Now comes Denise Campbell on behalf of herself and others similarly situated and for their complaint states as follows:

**Parties**

1.     Plaintiff, Denise Campbell ("CAMPBELL"), is a resident of Bruce Mines, Ontario, Cananda.  CAMPBELL has MS.

2.     Defendant, Immunosyn Corporation ("IMMUNOSYN"), is a Delaware corporation with its principal place of business at 4225 Executive Square, Suite 260, La Jolla, California.

3.     Defendant, Argyll Biotechnologies, LLC ("ARGYLL BIOTECH"), is a Texas limited liability company with its principal place of business at 4225 Executive Square, Suite 260, La Jolla, California.

4.     Defendant, Argyll Equities, LLC ("ARGYLL EQUITIES"), is a Texas limited liability company, with its principal place of business at 4225 Executive Square, Suite 260, La Jolla, California.

5.     Defendant, James T. Miceli ("MICELI"), is a resident of California.  MICELI is the Chief Executive Officer of ARGYLL BIOTECH and ARGYLL EQUITIES.

6.     Defendant, Douglas A. McClain, Jr. ("MCCLAIN"), is a resident of Georgia. MCCLAIN is the President of ARGYLL BIOTECH and ARGYLL EQUITIES and the Chief Financial Officer of IMMUNOSYN.

7.     Defendant, Frank Morales ("MORALES") is a resident of Brownsville, Texas, with a last known address of 2805 Hackberry Lane and at all material times hereto was associated with Rio Valley Medical Center.

8.     Defendant, Stephen Ferrone ("FERRONE"), is a resident of Illinois.  FERRONE is the President of IMMUNOSYN.

9.     Defendant, Douglas A. McClain, Sr. ("MCCLAIN SR.") is a resident of Texas. MCCLAIN SR. is an owner and/or controlling person with respect to ARGYLL EQUITIES and/or ARGYLL BIOTECH.

## Jurisdiction and Venue

10.     This action is brought personally by CAMPBELL pursuant to the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78m, 78r and 78t and RICO statute 18 U.S.C. § 1964 *et seq*.  Jurisdiction of this court and venue in this district are proper pursuant to 15 U.S.C. § 78aa and 18 U.S.C. § 1964 *et seq*.  Further, jurisdiction is conferred under 15 U.S.C. § 1332(a)(1) because the Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000 in damages.

## Governing Law

11.     Pursuant to 15 U.S.C. § 78m, IMMUNYSON and its principals are required to maintain public filings and books and records for the benefit of investors that accurately and fairly reflect the transactions and dispositions of the assets of the issuer and maintain financial records that conform with generally accepted accounting principles.

12.     Pursuant to 15 U.S.C. § 78r (a), "Any person who shall make or cause to be made any statement in any application, report, or document filed pursuant to this chapter or any rule or regulation thereunder or any undertaking contained in a registration statement as provided in subsection (d) of section 78o of this title, which statement was at the time and in the light of the circumstances under which it was made false or misleading with respect to any material fact, shall be liable to any person (not knowing that such statement was false or misleading) who, in reliance upon such statement, shall have purchased or sold a security at a price which was affected by such statement, for damages caused by such reliance, unless the person sued shall prove that he acted in good faith and had no knowledge that such statement was false or misleading. A person seeking to enforce such liability may sue at law or in equity in any court of competent jurisdiction. In any such suit the court may, in its discretion, require an undertaking for the payment of the costs of such suit, and assess reasonable costs, including reasonable attorneys' fees, against either party litigant."

13.     Pursuant to 15 U.S.C. § 78t (a) and (b), "Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." "It shall be unlawful for any person, directly or indirectly, to do any act or thing which it would be unlawful for such person to do under the provisions of this chapter or any rule or regulation thereunder through or by means of any other person."

14.     Pursuant to 17 C.F.R. § 240.10b-5, "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

15.     Pursuant to 18 U.S.C. § 1964 (c) Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962.

16.     Pursuant to 18 U.S.C. § 1962 (a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.  Pursuant to 18 U.S.C. § 1962 (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.  Racketeering is defined by Section 1961 and includes mail fraud.

## Background of the Defendants and Corporate Entities

17.     On or about January 15, 1999, MICELI, MCCLAIN, SR. and MCCLAIN, JR. entered into a written partnership agreement, "for the purpose of devising, creating, designing, pursuing, formulating, enacting and engaging in all companies, corporations, partnerships or legal entities which are or have been or will be used by the parties for the purpose of creating any income or tangible item recognized as having value foreign or domestic" with a term of "fifteen years." (hereinafter the "Partnership Agreement").

18.     On or about August 26, 1999, MICELI was convicted of felony money laundering, forgery, perjury and theft over $100,000 in the State of Illinois.

19.     Thereafter, MCCLAIN, SR., MCCLAIN and MICELI worked together at International Profit Associates ("IPA") in Illinois.

20.     Through IPA, MCCLAIN SR. became involved with a public entity known as Nextpath Technologies.  MCCLAIN SR. was able to obtain and sell a large volume of shares of Nextpath Technologies to unsuspecting investors, based on false information concerning the company, for approximately $6,000,000.

21.     MCCLAIN SR. received funds and/or distributed Nextpath Technologies stock certificates through the US mail or other carriers interstate to unsuspecting investors.

22.     MCCLAIN SR. communicated with prospective investors over the telephone, interstate, to convince and deceive them into purchasing Nextpath Technologies stock.

23.     Salvatore and Frank Bramante (hereinafter the "Bramanates") were investors duped by MCCLAIN SR. to buy Nextpath Technologies stock based upon false and misleading information.

24.     The Bramantes were promised unrestricted stock in Nextpath Technologies, a public company, but after much delay, were provided with restricted stock by MCCLAIN, SR.

25.     The Bramantes sued MCCLAIN, SR. in United States District Court for the District of Massachusetts and obtained judgment against him on June 1, 2005 for about $4,500,000.

26.     After MCCLAIN, SR.'s involvement with Nextpath Technologies, MCCLAIN, SR., MCCLAIN, JR. and MICELI left IPA and worked together in an entity called FIT Management.

27.     Money from the sale of Nexthpath Technologies stock was used to finance the start of FIT Management.  FIT Management financed the start of ARGYLL EQUITIES.

28.     As a result of numerous civil judgments against FIT Management and/or MCCLAIN, SR., MCCLAIN, SR. did not publically own ARGYLL EQUITIES, but instead operated for the company as a consultant and secret owner.

29.     ARGYLL EQUITIES had the appearance of a legitimate financial/stock lender, but operated more akin to a Ponzi scheme, as described in a lawsuit brought by Gerald W. Schlief, Southern District of Texas, Houston Division, C.A. No. 08-cv-2128.  The Gerald W. Schlief lawsuit alleges that MICELI, MCCLAIN SR. and others violated the Racketeer Influenced and Corrupt Organizations Act ("RICO") and committed numerous racketeering activities.

30.     ARGYLL EQUITIES was used to defraud several investors and/or companies, including but not limited to Gerald W. Schlief, T. Paul Bulmahn, Siko Venture Limited, Louis D. Paolino, Jr., and Servicios Directivos Servia, S.A. de C.V.   Each of these persons/entities brought civil lawsuits against ARGYLL EQUITIES.

31.     Upon information and belief, numerous unsatisfied civil judgments exist against ARGYLL EQUITIES, FIT Management, and MCCLAIN, SR. for fraud and/or stock lending fraud.  See Exhibit A hereto (According to counsel to Defendants, Mr. Bulmahn has unsatisfied judgments in the approximate amount of $69,000,000 against Argyll Equities, James T. Miceli and Douglas A. McClain, Jr.  Further, Plaintiffs in SA-10-CA-534-OLG hold an unsatisfied judgment against Douglas A. McClain, Sr. entered June 1, 2005 in the face sum of $575,000.)

32.     During ARGYLL EQUITIES' demise in 2006 and 2007, as a reputable and financially stable company, through numerous lawsuits and judgments entering against it, ARGYLL EQUITIES' financed the start up of ARGYLL BIOTECH.

33.     ARGYLL BIOTECH and/or ARGYLL EQUITIES financed the start up of IMMUNOSYN and financially control IMMUNOSYN.

34.     At all relevant time hereto, ARGYLL BIOTECH claimed to own, develop, and promote a drug called SF-1019.

35.     At all relevant times hereto, IMMUNOSYN claimed in its SEC filings and website to own the exclusive rights to market and sell SF-1019.

36.     Similar to MCCLAIN, SR.'s false and misleading promotion and sale of Nextpath Technologies stock, the DEFENDANTS, acting together, have engaged in the false and misleading promotion of IMMUNOSYN stock, for financial gain, to the detriment of others.

37.     Upon information and belief, the MICELI, MCCLAIN, JR. and/or MCCLAIN, SR., personally or through entities that they control, have sold IMMUNOSYN stock from April 2007 through the present totaling more than $14,000,000.

38.     MICELI, MCCLAIN, SR., and MCCLAIN, JR., personally and through ARGYLL BIOTECH, have been involved in the distribution of SF-1019 throughout the United States.

39.     MICELI, MCCLAIN, SR., and MCCLAIN, JR. have been personally involved in the retention of profits from the sale of SF-1019.

40.     MICELI, MCCLAIN, SR., and MCCLAIN, JR. have been personally involved in the development of media statements and promotional statements made on their companies' websites concerning SF-1019.

41.     MICELI, MCCLAIN, SR., and MCCLAIN. JR. control ARGYLL EQUITIES, ARGYLL BIOTECH and IMMUNOSYN.

42.     MICELI, MCCLAIN, SR., and MCCLAIN, JR. have financially stripped ARGYLL EQUITIES and ARGYLL BIOTECH of assets purposely and through the judgments rendered against said companies due to their active fraud.  Prior to leaving ARGYLL EQUITIES and ARGYLL BIOTECH "judgment proof," said entities were used by MICELI, MCCLAIN, SR. and MCCLAIN, JR. to commit fraud upon DENISE CAMPBELL.

43.     With respect to the operation of ARGYLL EQUITIES and ARGYLL BIOTECH, MICELI, MCCLAIN, SR., and MCCLAIN. JR. have failed to follow corporate formalities, segregate their personal assets from business assets, and make required tax filings for money received by them from the companies and money paid to employees, consultants, and 1099 labor.

44.     MICELI, MCCLAIN, SR., and MCCLAIN, JR. are the alter egos of ARGYLL EQUITIES and ARGYLL BIOTECH.

45.     MICELI, MCCLAIN, SR., MCCLAIN, JR. and ARGYLL BIOTECH knowingly provided SF-1019 to FRANK MORALES and MITCHELL MELLING to sell and administer to MS sufferers in and outside of the United States.

### The Fraud Upon the Plaintiff

46.     CAMPBELL viewed Alan Osmond on Larry King live and heard about a drug he was taking and promoting for MS.

47.     Following the TV show, CAMPBELL went to Alan Osmond's website, which led her to ARGYLL BIOTECH's website, and ultimately IMMUNOSYN's website, to read about SF-1019, a drug being promoted by Alan Osmond, ARGYLL BIOTECH and IMMUNYSON.

48.     ARGYLL BIOTECH's website is linked to a promotional letter from Alan Osmond for ARGYLL BIOTECH and SF-1019.

52.     On or about January 10, 2008, after viewing IMMUNOSYN's, ARGYLL BIOTECH's and Alan Osmond's websites, CAMPBELL purchased 200 shares of Immunyson stock at $2.35 a share for a total cost to her of $508.48.

53.     IMMUNOSYN's website made statements concerning the approvals for and effectiveness of SF-1019, not limited to, a claim that SF-1019 had been effective in diabetic ulcer healing.

54.     In early March 2008, CAMPBELL communicated, through her sister, with Alan Osmond via email concerning SF-1019 and was directed by someone responding to Alan Osmond's emails to Dr. Mitchell Melling in Utah to learn about obtaining SF-1019.

55.     During March/April 2008, CAMPBELL spoke to Krystal Bradshaw at Dr. Mitchell Melling's office concerning obtaining SF-1019.

56.     Ms. Bradshaw, an agent of Dr. Melling, assured CAMPBELL of the success patients were having with SF-1019.

57.     Dr. Mitchell Melling's office referred CAMPBELL to Dr. Frank Morales in Texas to obtain SF-1019.

58.     MORALES was obtaining SF-1019 from ARGYLL BIOTECH or its agent.

59.     CAMPBELL contacted MORALES' office during April 2008 to learn about SF-1019 and to obtain it.

60.     CAMPBELL was told by an agent of MORALES that patients of Dr. Morales were having great success with SF-1019, some of them "getting out wheel chairs and walking."

61.     In April and May 2008, CAMPBELL purchased SF-1019 from MORALES through Rio Valley Medical Center.

62.     MORALES shipped SF-1019 from Brownsville, Texas to Michigan so that CAMPBELL could pick up the drug in the United States.

63.     CAMPBELL paid MORALES and/or Rio Valley Medical Center about $1,450 for four vials of SF-1019 ("BATCH ONE").

64.     MORALES was the owner of Rio Valley Medical Center.

65.     SF-1019 has never been approved by the FDA for sale in the United States.

66.     SF-1019 has not passed typical safety protocols for FDA approval.

67.     CAMPBELL injected herself with the SF-1019 from BATCH ONE. CAMPBELL was under the impression that the SF-1019 from BATCH ONE improved her medical condition.

68.     On August 12, 2008, IMMUNOSYN claimed to have received governmental approval from Malaysia for SF-1019 for treatment, marketing and distribution in Malaysia.

69.     Based upon the information on IMMUNOSYN's and ARGYLL BIOTECH's website, including the new governmental approval received in Malaysia, and the success stories heard from MORALES' office, CAMPBELL purchased IMMUNYSON stock again on October 15, 2008.

70.     Upon information and belief, Alan Osmond was paid by ARGYLL EQUITIES and/or ARGYLL BIOTECH to promote SF-1019 and received stock to promote SF-1019.

71.     Alan Osmond promoted SF-1019 by claiming its effectiveness, to further his financial interest in the product, which was not disclosed to CAMPBELL and others.

72.     In 2007, a safety study was performed on SF-1019 by one or more of the DEFENDANTS through Iso-tex Diagnostics in Friendswood, Texas, the manufacturer of SF-1019.  Four rats died during the safety study.  The draft report of the results stated, among other things, "[the study] should not be used in any way, shape or form to advance product registration of SF-1019 with any regulatory agency.  To do so would invite problems.  The deaths during the study are troubling."

73.     The DEFENDANTS have not reported the results of safety studies on SF-1019 to CAMPBELL or the public, said results would have been important to CAMPBELL and others in deciding whether to take SF-1019.

74.     IMMUNOSYN claims in its annual report for the fiscal year ending December 31, 2007 that, "Argyll Biotech's only data regarding the safety and efficacy of SF-1019 is based on uncontrolled observations of a precursor to SF-1019 among a small group of individuals, not SF-1019 itself."

75.     ARGYLL BIOTECH claimed on its website that, "Following a series of toxicity studies in animals, SF-1019 demonstrated a positive safety result."

76.     ARGYLL BIOTECH also claimed on its website to have completed a first phase proof of concept trial in Europe.

77.     ARGYLL BIOTECH also claimed to have obtained "informed consent" approval in the EU and "compassionate waiver" status in the US.

78.     Upon information and belief, ARGYLL BIOTECH has not completed a first phase proof of concept trial in Europe and has not obtained approval to distribute SF-1019 in the EU or US under an "informed consent" or "compassionate waiver" status.

79.     Being unaware of Alan Osmond's financial interest in SF-1019/Immunosyn and the safety studies on SF-1019, CAMPBELL relied upon the promotional statements made by Alan Osmond, Immunosyn's website, and ARGYLL BIOTECH's website, in purchasing SF-1019 and Immunosyn stock.

79.     In May 2008, CAMPBELL contacted MORALES for a second time to obtain more SF-1019.  MORALES sold CAMPBELL 12 vials of what was purported to be SF-1019 for about $3,750 ("BATCH TWO").

80.     CAMPBELL injected herself with SF-1019 from BATCH TWO over a period of time.

81.     Upon information and belief, BATCH TWO contained no active agents and/or was water or saline solution.

8

82.     MORALES and/or the DEFENDANTS misrepresented to CAMPBELL the contents of the drug being sold to her as SF-1019.

83.     CAMPBELL relied upon the representations in the aforementioned websites and of MORALES in purchasing SF-1019.

84.     After becoming concerning with BATCH TWO of SF-1019, CAMPBELL sold IMMUNOSYN stock on or about May 8, 2009 at a monetary loss.

85.     IMMUNOSYN has reported no revenue for 2007 and 2008.  IMMUNOSYN's 10-Q dated May 15, 2008 claims, "As of the date of this report, we have no revenue and limited operations."  This 10-Q is signed by MCCLAIN and FERRONE.

86.     SF-1019 has been sold for a profit in the United States during at least 2008.

87.     ARGYLL BIOTECH, through MICELI, MCCLAIN, SR. and MCCLAIN, JR. have been selling SF-1019 through various commercial channels, including MORALES and Mitchell Melling, exchanging SF-1019 for services and good will, and failing to report and/or allocate income to IMMUNOSYN to the detriment of its stockholders, including CAMPBELL, an in violation of IMMUNOSYN's exclusive right to market and sell SF-1019.

88.     The SEC filings made by IMMUNOSYN, as reported and/or signed by MCCLAIN, JR. and FERRONE, have been false and/or misleading.

## COUNT I – THE EXCHANGE ACT/SECURITIES FRAUD

89.     Plaintiff hereby incorporate and restates herein the foregoing paragraphs 1-88 as if fully stated herein.

90.     MCCLAIN, JR. and FERRONE, as officers of IMMUNOSYN, signed an SEC Filing known as a 10-QSB for the period ending 9/30/07 stating that IMMUNYSON had the "exclusive worldwide license to market, distribute and sell . . . SF-1019."

91.     IMMUNOSYN's website and press release dated October 25, 2007 contained therein, as reviewed and approved for publication by MCCLAIN, JR. and FERRONE, claimed that IMMUNYSON had the exclusive worldwide license to market, distribute and sell SF-1019 (the "Exclusive License").  See Exhibit B hereto.

92.     CAMPBELL, after review and reasonable reliance upon the representations contained in IMMUNOSYN's website and the press release dated October 25, 2007, including the representation that IMMUNOSYN had the exclusive worldwide license to market, distribute and sell SF-1019, bought IMMUNOSYN stock during January 2008.

93.     IMMUNOSYN, MCCLAIN, JR. and FERRONE knowingly misrepresented to potential purchasers of IMMUNOSYN stock, including CAMPBELL, that IMMUNOSYN held the Exclusive License as to SF-1019 to induce CAMPBELL and others to purchase stock in IMMUNOSYN.

94.     IMMUNOSYN, MCCLAIN, JR. and FERRONE were each aware of the sale, or intended sale, of SF-1019 through commercial channels in contravention of IMMUNOSYN's Exclusive License at the time it was represented to CAMPBELL through IMMUNOSYN's website and press release that IMMUNOSYN would hold said Exclusive License.

95.     The IMMUNOSYN stock purchased by CAMPBELL during January 2008 was ultimately sold for less than she paid.

96.     IMMUNOSYN has reported no income from any source in its SEC filings from inception to date.

97.     The known violation of the Exclusive License, IMMUNOSYN's only asset, and the loss of revenue from the sale of SF-1019 by others has negatively impacted IMMUNOSYN's stock price, to the detriment of CAMPBELL.

98.     Further, if CAMPBELL had known that others could sell SF-1019 outside of IMMUNOSYN's Exclusive License, she would not have purchased IMMUNOSYN stock.

99.     On July 16, 2008, IMMUNOSYN issued a press release on its website and elsewhere, as reviewed and approved for publication by MCCLAIN, JR. and FERRONE, stating, "Immunosyn Corporation announced today that the distribution of SF-1019 in the State of Utah is anticipated to begin shortly though Renewed Hope Clinic in Beaver, Utah."  See Exhibit C hereto.

100.    The press release concerning distribution of SF-1019 through Renewed Hope Clinic in Beaver, Utah was false when made and only made to promote SF-1019 and to sell IMMUNOSYN stock.

101.    Dr. Mitchell Melling was associated with the Renewed Hope Clinic in Beaver, Utah.

102.    IMMUNOSYN, MCCLAIN, JR. and FERRONE knew the press release of July 16, 2008 concerning distribution through Renewed Hope Clinic was false when made because, on July 9, 2008, Dr. Mitchell Melling and Doug McClain of Argyll Biotech went before the Utah Physician's Board to seek approval for a pharmacy license to sell/administer SF-1019 in Utah. See Exhibit D hereto.

103.    During the July 9, 2008 meeting before the Utah Physician's Board, Dr. Melling acknowledged that he did not have information about the facility in Texas manufacturing SF-1019, that he understood that SF-1019 was not approved by the FDA, and that "he does not know if [SF-1019] is what it is suppose to be."

104.    It was confirmed during the July 9, 2008 meeting before that Utah Physician's Board that there was no error in the prior administrative decision to not license Dr. Melling to sell SF-1019 in Utah.

105.    On August 12, 2008, IMMUNOSYN issued a press release on its website and elsewhere, as reviewed and approved for publication by MCCLAIN, JR. and FERRONE, stating, "Immunosyn Corporation announced today that marketing, distribution and patient treatment approval has been granted by the Ministry of Health Malaysia for SF-1019 in the Private Pay Health Sector in Malaysia." See Exhibit E hereto.

106.    IMMUNOSYN, MCCLAIN, JR. and FERRONE knew the press release of August 12, 2008 was false when made because IMMUNSOYN's SEC filings published after August 12, 2008 indicate that no approvals have been received in any country for the sale or distribution of SF-1019 at any time.

107.    CAMPBELL reviewed the July 16, 2008 and August 12, 2008 press releases by IMMUNOSYN and reasonably relied upon the representations contained therein in purchasing IMMUNOSYN stock during October 2008 and February 2009.

108.    CAMPBELL sold the stock purchased in October 2008 and February 2009 during May 2009 at a monetary loss.

109.    CAMPBELL was induced to purchase IMMUNOSYN stock by the aforementioned press releases made by IMMUNOSYN, by and/or with the consent of IMMUNOSYN's officers, MCCLAIN, JR. and FERRONE, said press releases proving to be false and/or made with reckless disregard for the truth.

110.    During the period of time that CAMPBELL was purchasing stock in IMMUNOSYN, starting in January 2008 and ending in February 2009, MICELI, MCCLAIN, JR., ARGYLL BIOTECH, and other offshore entities controlled by them, in whole or in part, were selling IMMUNOSYN corporation stock at great profit, based upon the false market value being maintained by the release of false and misleading press releases, three of said press releases being set forth *supra*.

WHEREFORE, CAMPBELL prays for damages in amount to be proven at trial against the Defendants Immunosyn Corporation, Stephen Ferrone, and Douglas A. McClain, Jr., jointly and severally, for their violations of the Exchange Act and securities fraud, plus interest, costs and attorneys fees.

## COUNT II – FRAUD

111.    Plaintiff hereby incorporate and restates herein the foregoing paragraphs 1-110 as if fully stated herein.

112.    During April 2008, MORALES, through a telephone call between CAMPBELL and MORALES' agent, held himself out to CAMPBELL to be a medical doctor in the State of Texas, the location of his clinic.  Further, though his agent, MORALES represented to CAMPBELL the success of SF-1019 by stating patients were getting out of wheel chairs and walking.

113.    At all relevant times hereto, MORALES was not a licensed medical doctor in the State of Texas.

114.    During April and May 2008, MORALES was practicing medicine in the State of Texas without a medical license in violation of Section 155.001 of the Texas Occupations Code.

115.    In purchasing and receiving SF-1019 from MORALES, CAMPBELL reasonably believed that MORALES was a licensed medical doctor in the State of Texas and that he was treating patients as a licensed medical doctor with SF-1019.

116.    CAMPBELL reasonably believed that MORALES was licensed to practice medicine in the State of Texas and she would not have purchased SF-1019 from MORALES if he did not hold himself out to be a medical doctor directly or through his clinic and agents.

117.    CAMPBELL has been harmed by reasonably relying upon representations that MORALES was a medical doctor, that he was successfully treating patients with MS as a medical doctor and that she was being sold SF-1019 by a medical doctor.

118.    CAMPBELL had suffered monetary damages from purchasing SF-1019 and unknown physical harm by taking an unapproved drug of unknown composition.

WHEREFORE, CAMPBELL prays for damages in amount to be proven at trial against the Defendants Morales for fraud, plus interest, costs and attorneys fees.

## COUNT III – RICO

119.    Plaintiff hereby incorporate and restates herein the foregoing paragraphs 1-118 as if fully stated herein.

120.    Defendants MICELI, MCLAIN, JR., and MCCLAIN, SR. are engaged in a scheme or enterprise to defraud MS sufferers in desperate need for help by selling them a drug called SF-1019 at great cost and expense which has no FDA approval and is not being sold by licensed medical professionals as required by law.

121.    Defendants MICELI, MCLAIN, JR., and MCCLAIN, SR. knew or should have known that it was illegal to sell and/or distribute SF-1019 through unlicensed medical doctors in the State of Texas and/or did so with reckless disregard for the law.

122.    Defendants MICELI, MCLAIN, JR., and MCCLAIN, SR. knew or should have known that MORALES was not licensed to practice as a medical doctor in the State of Texas.

123.    Defendants MICELI, MCCLAIN, SR. and MCCLAIN, JR. are also engaged in a scheme to sell SF-1019 for their own financial gain outside of the exclusive license held by the publically traded company they control, IMMUNOSYN.

124.     Defendants MICELI, MCCLAIN, SR. and MCCLAIN, JR. are distributing SF-1019 and IMMUNOSYN stock certificates interstate through the US mail or other carriers.

125.    Defendants MICELI, MCCLAIN, SR. and MCCLAIN, JR. are using email, websites and telephone communications to sell SF-1019 interstate.

126.    MICELI, MCCLAIN, SR. and MCCLAIN, JR. operate as an enterprise through various entities as described *supra* and through their association and agreement to make money.

127.    MICELI, MCCLAIN, SR. and MCCLAIN, JR.  have engaged in a pattern of racketeering activity, to the detriment of others, including CAMPBELL.

128.    MICELI, MCCLAIN, SR. and MCCLAIN, JR. have engaged in monetary transactions (including but not limited to the creation of IMMUNOSYN and ARGYLL BIOTECH) with money derived from unlawful activities and/or racketeering activity in prior enterprises.

129.    There is a likelihood of continuing criminal activity by MICELI, MCCLAIN, JR. and MCLAIN, SR.  See Exhibit F hereto.

130.    As a result of the unlawful conduct and RICO violations committed by MICELI, MCCLAIN, SR. and MCCLAIN, JR., CAMPBELL has been damaged.

WHEREFORE, CAMPBELL prays for damages in amount to be proven at trial against James Miceli, Douglas A. McClain Sr., and Douglas McClain, Jr. for their violations of RICO, plus interest, costs and attorneys fees.

## COUNT IV – CONSPIRACY TO VIOLATE RICO

131.    Plaintiff hereby incorporate and restates herein the foregoing paragraphs 1-130 as if fully stated herein.

132.    RICO prohibits any person from conspiring to violate RICO.

133.    MICELI, MCCLAIN, SR., MCCLAIN, JR. had agreements and/or understandings with each other to engage in racketeering activities individual and through companies they would own and control.

134.    MORALES had an agreement with MCCLAIN, SR. to sell SF-1019 for profit, without a license to sell said drug in the State of Texas, and in violation of Section 155.001 of the Texas Occupations Code.

135.    MORALES sold SF-1019 for a profit in furtherance of the scheme or enterprise to defraud MS sufferers in desperate need for help by selling them a drug touted as the cure.

136.    MCCLAIN, SR. has not filed federal tax returns since 2006.

137.    MCCLAIN, SR. has held himself out to the owner of ARGYLL BIOTECH, its Chief Science Officer and/or its Director of Public Relations in his dealings with MORALES.

138.    MCCLAIN, SR. has personally paid ARGYLL BIOTECH's financial obligations and received money from ARGYLL BIOTECH to pay his personal expenses, such that ARGYLL BIOTECH's funds and money have been comingled with those of MCCLAIN, SR.

139.    MCCLAIN, SR. has received income from ARGYLL BIOTECH and neither MCCLAIN, SR. nor ARGYLL BIOTECH have reported the income to the IRS.

140.    ARGYLL BIOTECH and ARGYLL EQUITIES of the alter egos of MICELI, MCCLAIN, SR. and MCCLAIN, JR.

141.    MICELI, MCCLAIN, SR., MCCLAIN, JR., ARGYLL BIOTECH, ARGYLL EQUITIES, and FRANK MORALES have committed racketeering activities and/or acts in furtherance of racketeering activities.

142.    CAMPBELL was harmed by the conspiracy to violate RICO and has suffered actual damages.

WHEREFORE, CAMPBELL prays for damages in amount to be proven at trial against James Miceli, Douglas A. McClain Sr., Douglas McClain, Jr., Argyll Biotechnologies, LLC, Argyll Equities, LLC and Frank Morales for their violations of RICO, plus interest, costs and attorneys fees.

## COUNT V – UNJUST ENRICHMENT

143.    Plaintiff hereby incorporate and restates herein the foregoing paragraphs 142 as if fully stated herein.

144.    MORALES has been unjustly enriched by the sale of water/saline as SF-1019 to CAMPBELL.

145.    MORALES has received money as a result of the sale of SF-1019 to CAMPBELL and has been unjustly enriched by the amount of money received and should be required to disgorge that amount.

WHEREFORE, CAMPBELL prays for damages in amount to be proven at trial against the MORALES for unjust enrichment, plus interest, costs and attorneys fees.

## COUNT VI - EXEMPLARY DAMAGES

146.    Plaintiff hereby incorporate and restates herein the foregoing paragraphs 1-145 as if fully stated herein.

147.    CAMPBELL seeks exemplary damages in connection with her claims of fraud in the largest amount allowable by law.

148.    Further, the actions and conduct of Douglas McClain, Jr., Stephen Ferrone, James T. Miceli, Douglas A. McClain, Sr. and Frank Morales was committed knowingly and intentionally and violates Section 32.46 of the Texas Penal Code, insofar as the Defendants sold SF-1019 and Immunosyn Corporation stock by deception.

WHEREFORE, CAMPBELL prays for damages in amount to be proven at trial, including direct, consequential and mental pain and suffering, against Douglas McClain, Jr., Stephen Ferrone, James T. Miceli, Douglas A. McClain, Sr. and Frank Morales in accordance with Section 32.46 of the Texas Penal Code, plus interest, costs and attorneys fees.

### Class Action Averments

149.    The joinder of all members of the class of persons harmed by the aforementioned conduct is impractical.

150.    The member class includes, potentially, all those individuals sold SF-1019 and all those individuals that purchased IMMUNOSYN stock.  Given that there is over 270 million outstanding shares, the member class is likely large.

151.    The claims are typical among the class because: 1) the batch of SF-1019 that was water/saline would likely have been distributed to more than just CAMPBELL, 2) the profits derived and not reported from the sale of SF-1019 would equally affect all stockholders, 3) the violation of the exclusive sale rights to IMMUNYSON of SF-1019 would equally affect all the stockholders, 4) the same information concealed from CAMPBELL, that would have been material to her purchase of SF-1019 and IMMUNOSYN stock would have been equally important to other class members, and 5) the misrepresentations in IMMUNOSYN's SEC filings and press releases impacted all investors in IMMUNOSYN and users of SF-1019.

152.    The representative parties will fairly and adequately protect the interests of the class.

153.    The claims have questions of law and fact common to the class that predominate over any questions affecting only individual class members and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

154.    The prosecution of separate actions by individual member of the class would create a risk of inconsistent results and/or be dispositive of the interests of the other members not parties to the adjudications.

155.     All of the stockholders affected by a violation of the exclusive sale rights of IMMUNYSON and/or profits not reported to IMMUNYSON from the sale of SF-1019 are important common issues to the class that predominate over any questions affecting only individual class members.

156.     A class action is superior to other methods for the fair and efficient adjudication of the claims herein asserted.  The likelihood of individual class members prosecuting separate individual actions is remote due to the relatively small monetary loss suffered by each potential class member as compared to the burden and expense of prosecuting litigation of this nature and magnitude.  Further, the potential class members are in many cases person suffering from MS that are on public assistance or otherwise financially incapable of financing separate lawsuits. Absent a class action, DEFENDANTS are likely to avoid liability for their wrongdoing, and class members are unlikely to obtain redress for their wrongs alleged herein.

### Prayer for Class Certification and Relief

WHEFEFORE, the Plaintiff requests class certification pursuant to F.R.C.P. 23 and that judgment be entered in favor of the Plaintiff and the class as certified, and all such further relief granted as may be appropriate under the circumstances, including an award of costs and attorney fees.

### Jury Demand

Plaintiff demands a trial by jury on all Counts so triable.

PLAINTIFF, DENISE CAMPBELL,
by her attorneys,

*/s/ Andrew J. Tine*
Andrew J. Tine
RI State Bar No. 633639
Law Offices of Andrew J. Tine
251 Thames Street, 2nd Floor
Bristol, Rhode Island 02809
Telephone:     (401) 396-9002
atine@tinelaw.com
and

*/s/ Gershon Cohen*
Gershon Cohen
State Bar No. 04508325
1250 N.E. Loop 410, Suite 234
San Antonio, Texas 78209
Telephone:     (210) 826-7299
gershon.cohen@gmail.com

16

## CERTIFICATE OF SERVICE

I, Andrew J. Tine, hereby certify that I filed the foregoing electronically this 30th day of September 2010 using the ECF system for the Southern District of Texas and that all counsel of record will receive electronic notice of said filing.

*/s/Andrew J. Tine*